UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

            Plaintiff,

  -vs-                            Case No. 25-CR-4-JDP

TYLER J. BEELER,               Madison, Wisconsin
                                April 8, 2025
            Defendant.         11:09 a.m.

_____

STENOGRAPHIC TRANSCRIPT OF PRETRIAL MOTION HEARING
HELD BEFORE U.S. MAGISTRATE JUDGE ANITA M. BOOR
*TRANSCRIBED FROM DIGITAL RECORDING*

APPEARANCES:

For the Plaintiff:

               Office of the United States Attorney
               BY:  MEGAN R. STELLJES
               222 West Washington Avenue, Suite 700
               Madison, Wisconsin  53703

For the Defendant:

               Zachar Law Office, LLC
               BY:  CHRISTOPHER M. ZACHAR
               201 Main Street, Suite 210
               La Crosse, Wisconsin  54601

Also appearing:  TYLER J. BEELER, Defendant

Jennifer L. Dobbratz, RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 410
Madison, Wisconsin  53703
(608) 261-5709

**INDEX OF WITNESSES**

GOVERNMENT'S WITNESSES          EXAMINATION                    PAGE

COLIN SHERDEN    Direct Examination by Ms. Stelljes          5
                 Cross-Examination by Mr. Zachar            18
                 Redirect Examination by Ms. Stelljes       41
                 Examination by the Court                   42
                 Redirect Examination by Ms. Stelljes       48
                 Recross-Examination by Mr. Zachar          49
                 Redirect Examination by Ms. Stelljes       50
ALEX VANG        Direct Examination by Ms. Stelljes         51
                 Cross-Examination by Mr. Zachar            56
                 Redirect Examination by Ms. Stelljes       59
                 Examination by the Court                   60
                 Recross-Examination by Mr. Zachar          61
                 Redirect Examination by Ms. Stelljes       63

*  *  *

11    (Proceedings called to order at 11:09 a.m.)

12         THE CLERK:  All rise.  The United States District Court

13    for the Western District of Wisconsin is now in session.

14    Magistrate Judge Anita Marie Boor presiding.  Please be seated

15    and come to order.

16         Case No. 25-CR-4-JDP, *United States of America v. Tyler J.*

17    *Beeler*, called for a pretrial motion hearing.

18         May we have the appearances, please.

19         MS. STELLJES:  Good morning.  Megan Stelljes on behalf

20    of the United States.

21         MR. ZACHAR:  Good morning, Your Honor.  Mr. Beeler

22    appears in person and in custody with his attorney, Chris

23    Zachar.

24         THE COURT:  All right.  Well, good morning to all of

25    you, and good morning to you, Mr. Beeler.

```
 1              We are here today for an evidentiary hearing --

 2              Please be seated.

 3         We are here today for an evidentiary hearing, and let me

 4    review what I have gone over in advance.  So I have the motion

 5    that came in at docket 13.  I have looked that over and have

 6    reviewed some of the cases that are cited in the motion.  I also

 7    have a letter from the government outlining the exhibits that

 8    the government intends to use at the hearing today along with a

 9    time line, and I've looked that over as well.  So that is what

10    has been provided to me.  That is what I have reviewed.

11         Here's how I would like to proceed today:  I'd like to get

12    a brief overview from each side how they think that the hearing

13    is going to unfold.  If you want to make some sort of opening

14    statement, that is fine.  It is not expected, but if you want to

15    at least provide some sort of overview of how you think the

16    evidence is going to unfold, that is up to you.  We'll take the

17    evidence, and then we'll wrap up at the end and talk about the

18    briefing schedule.

19         So that is how I'd like to proceed today.  Let me start

20    with you, Attorney Stelljes.  Are you going to take me up on my

21    offer for an opening statement, or are you just going to launch

22    into your evidence taking?

23              MS. STELLJES:  I'll preview how I expect the evidence

24    to come in briefly with a few notes.  (Inaudible) -- he just

25    received a promotion and Officer Alex Vang.
```

1          THE COURT:  In that order?

2          MS. STELLJES:  Yes.

3          THE COURT:  And I see there was an exhibit list filed

4    with the five exhibits, including the time line.

5      Attorney Zachar, any objections to these exhibits?

6          MR. ZACHAR:  No objection, Your Honor, with the caveat

7    that we may add a couple of time entries to the time line.

8          THE COURT:  All right.  Well, we'll accept it in its

9    current form, and so all five exhibits are accepted and

10   admitted.

11         MS. STELLJES:  With that, the government expects

12   Sergeant Sherden to testify about his traffic stop of

13   Mr. Beeler, that -- the basis for the traffic stop, the

14   transport of Mr. Beeler to the jail, the conversations that took

15   place at the jail regarding what was going to happen with the

16   Escalade in terms of a third party coming to retrieve it from

17   the street, and then Officer -- excuse me, Sergeant Sherden will

18   also testify about his factual basis for searching the Escalade.

19     Officer Vang will testify about his duties waiting with the

20   Escalade for this third party to arrive, and I expect him to

21   testify that he would have released the Escalade to this third

22   party had she arrived before drugs were discovered on Mr. Beeler

23   at the jail and the decision was made to search the Escalade.

24         THE COURT:  Okay.  Thank you, Attorney Stelljes.

25     Attorney Zachar, is there anything more that you would like

```
 1    to add in terms of an overview and how you expect to proceed
 2    today?
 3            MR. ZACHAR:  No, Your Honor.
 4            THE COURT:  Okay.  Well, then I think we can get
 5    started.
 6            MS. STELLJES:  The government calls Sergeant Colin
 7    Sherden, and I can go -- Gwen can go get him.
 8        COLIN SHERDEN, GOVERNMENT'S WITNESS, SWORN
 9            THE CLERK:  Please have a seat.
10                      DIRECT EXAMINATION
11    BY MS. STELLJES:
12    Q    Good morning.  Would you please state and spell your name
13    for the record.
14    A    Colin Sherden, C-O-L-I-N S-H-E-R-D-E-N.
15    Q    Where are you employed?
16    A    The City of LaCrosse Police Department.
17    Q    And what's your title?
18    A    Currently, I'm serving as a sergeant on night shift.
19    Q    What was your title in August of 2024?
20    A    I was the north side neighborhood resource officer.
21    Q    What did your duties entail when you were a neighborhood
22    resource officer?
23    A    It was a wide variety of duties.  A lot of it was community
24    engagement.  A lot of it was helping out with patrol.  It was
25    just kind of doing a bunch of different work out in the field.
```

1    Q    What were you doing on August 30th, 2024?

2    A    I was patrolling the north side.

3    Q    Did you perform a traffic stop?

4    A    Yes.

5    Q    Of who?

6    A    Mr. Beeler.

7    Q    Tell us what led to that traffic stop, please.

8    A    I had observed him driving on Copeland Avenue in his

9    Escalade.  I got behind the vehicle, saw the registration was, I

10   think, UR4462 [verbatim].  Upon running that registration, I saw

11   that it returned to him and that he had a valid -- an active

12   probation warrant.

13   Q    How did you recognize Mr. Beeler?

14   A    Prior contacts.

15   Q    Were you aware of his criminal history?

16   A    Generally, yes.

17   Q    What were you aware of?

18   A    To me, I was aware of his drug history.

19   Q    After you saw the probation warrant, what did you do?

20   A    I performed a traffic stop.

21   Q    What area of town did this take place in?

22   A    I activated my lights at Rose and Car Street.  We proceeded

23   through and then stopped at 600 Car Street.

24   Q    How would you describe that part of La Crosse?

25   A    It's in the lower north side.  In general, we can sometimes

COLIN SHERDEN - DIRECT

1    have more calls for service there.  Yeah.

2    Q    Is it an activity of relative -- is it an area of

3    relatively high drug activity compared to other parts of

4    La Crosse?

5    A    At 600 Car Street, there's a neighbor's house, and during

6    that duty as an NRO, she had forwarded me complaints of, like,

7    increased foot traffic, which she suspected was maybe drug

8    activity, but just a lot of increased foot traffic in that area

9    was from her.

10   Q    How many people were in the Escalade?

11   A    Just one.

12   Q    Who?

13   A    Mr. Beeler.

14   Q    Who was the vehicle registered to?

15   A    Mr. Beeler.

16   Q    Did you confirm the warrant was valid?

17   A    Yeah.  When I ran his registration, it came up that he did

18   have a warrant.

19   Q    What did you do with that information?

20   A    That's when the traffic stop was performed.

21   Q    After you stopped him, what did you do?

22   A    I conducted a driver's side approach and had Mr. Beeler

23   step out.

24   Q    How was his demeanor?

25   A    Initially, when he stepped out, he put the keys in the car

COLIN SHERDEN - DIRECT

```
1    and started walking towards the back of my -- to the back --

2    towards the front of my squad car.

3    Q    And how was his demeanor?

4    A    He took a phone out of his right pocket, and I could see

5    his hand start to shake.  I could immediately tell upon my

6    initial contact with him that he appeared nervous.

7    Q    What was going on with the phone?

8    A    The phone was ringing, and he was getting a phone call.

9    Q    What happened next?

10   A    He answered the phone -- well, he asked if he could answer

11   it first.  I told him not to.  And then he answered the phone.

12   Q    Could you overhear the person on the other end of the call?

13   A    Yes.

14   Q    What did that person sound like?

15   A    Initially, she sounded pretty stressed and frantic.  She

16   was asking questions about where he was stopped at, why he was

17   stopped, and I guess about, like, where the car was at.

18   Q    What happened when the call ended?

19   A    So he was placed under arrest.  I took advantage of that,

20   when he was distracted with the phone, to secure him into

21   handcuffs for that warrant.  Then he was escorted to the back of

22   my squad car.  I held onto his phone, and he wanted to make sure

23   that the phone screen went out.

24   Q    What do you mean by "went out"?

25   A    That the screen was locked.
```

COLIN SHERDEN - DIRECT

1    Q    Did you transport Mr. Beeler to jail?

2    A    Yes.

3    Q    Did he say anything during that transport?

4    A    Right after we had left to jail, we drove past his

5    Escalade.  He made a comment about wishing he had the windows

6    rolled up.  I asked why, and then he just said something similar

7    to, "For obvious reasons, I guess."

8    Q    Before you left to take him to jail, did you do anything

9    else at the scene?

10   A    I had called for Officer Hughes to arrive on scene to do a

11   K-9 sniff.

12   Q    Anything else?

13   A    I just -- that he was arrested and then secured in the back

14   of my squad car.  Officer Vang had arrived, and I briefed him on

15   that Ms. Kendhammer had expressed wanting to try and get the

16   vehicle back or come get the vehicle.

17   Q    Okay.  Let's break that down -- sorry about that -- a

18   little bit.

19        Who is Officer Vang?

20   A    He was the officer -- he was one of the officers that

21   arrived to assist with placing Mr. Beeler into custody.

22   Q    Okay.  And he arrived while you were still on the scene?

23   A    Yes.

24   Q    And what duties did you assign him with respect to the

25   Escalade?

COLIN SHERDEN - DIRECT

1    A    I wanted him to keep eyes on the Escalade.

2    Q    Okay.  Because it was still unlocked?

3    A    Still unlocked with the keys in it.

4    Q    You mentioned someone with the last name Kendhammer.  Who's

5    that?

6    A    To my knowledge, I believe that is Mr. -- I believe

7    Mr. Beeler has a child with her, so.

8    Q    And did you come to understand that she was the person on

9    the other end of the phone call?

10    A    Yes.

11    Q    And what did you tell Officer Vang about the vehicle?

12    A    That she was going to come by and get it.

13    Q    So she was free to leave with the vehicle at this point, if

14    she had arrived?

15    A    If she had arrived, yeah.

16    Q    Where was she?

17    A    I believe she said she was coming from Holmen.

18    Q    And how far is Holmen from La Crosse, about?

19    A    From 600 Car Street, I'd say maybe 15 minutes, depending on

20    what part of Holmen you're coming from.  Maybe 15, 20 minutes.

21    Q    Did you ask Officer Vang to wait with the vehicle?

22    A    Yes.

23    Q    Did you eventually arrive at the jail with Mr. Beeler?

24    A    Yes.

25    Q    What happened at the jail?

COLIN SHERDEN - DIRECT

1    A    I filled out the booking card and -- to have him get turned

2    over in -- turned over to La Crosse County Jail staff.

3    Q    Anything else?

4    A    Mr. -- or Officer Vang had called questioning, like, the

5    status of what we can do with Mr. Beeler's vehicle.

6    Q    And what did you do with that question?

7    A    I spoke to Mr. Beeler and tried to come up with a plan on

8    how we can best secure it.

9    Q    Okay.  And what did Mr. Beeler say he wanted done with the

10   vehicle?

11   A    Initially, I'd offered if we could take the keys, roll up

12   the windows, and lock it up, or something to that effect, and he

13   didn't want to do that.  He just kept insisting that she would

14   be there.  So I asked if we can just have it unlocked with the

15   windows up.  Initially, he said no to that, and then later said

16   that it was fine.

17   Q    Okay.  So he wanted Officer Vang to continue to wait with

18   the Escalade, right?

19   A    To my understanding, yes.

20   Q    Okay.  And did you communicate that to Officer Vang?

21   A    Yes.

22   Q    Were there further conversations about the Escalade later

23   in time?

24   A    Later in time regarding, like, Mr. Beeler, what he wanted

25   done with it?

COLIN SHERDEN - DIRECT

1    Q    Yes.

2    A    Just that -- because I advised him Officer Vang had to go

3    to a different call, so I again asked him what he would want

4    done with it.

5    Q    And what did Mr. Beeler say?

6    A    He didn't want -- he just wanted it left kind of where it

7    was at, which is, to my knowledge, unlocked.

8    Q    Okay.  So Mr. Beeler wanted you to leave the Escalade -- or

9    wanted Officer Vang to leave the Escalade on the street unlocked

10   for Ms. Kendhammer to come pick it up?

11   A    Yes.

12   Q    What did you tell Officer Vang to do?

13   A    To leave it where it was at.

14   Q    Did you communicate any instructions about locking or not

15   locking the vehicle?

16   A    No.

17   Q    Why not?

18   A    I was still under the impression that it was still unlocked

19   with the windows down, as I had last seen it when I transported

20   Mr. Beeler to jail.

21   Q    Because you didn't receive any information that Officer

22   Vang had locked it, correct?

23   A    Correct.

24   Q    What did you do after turning Mr. Beeler over to jail

25   staff?

COLIN SHERDEN - DIRECT

1    A    I started to head back up to the stop location on Car

2    Street.

3    Q    Why?

4    A    Considering that Officer Vang had cleared for a different

5    call, I wanted to just keep eyes on the vehicle.  That was part

6    in case Ms. Kendhammer arrived so I can tell her what was going

7    on with the Escalade.

8    Q    And if she had arrived up until this point, what would you

9    have done with the vehicle?

10   A    If we had had the keys, I would have turned it over to her.

11   Q    Okay.  But Officer Vang had the keys, right?

12   A    Yes.

13   Q    So what if she had come and Officer Vang -- what would you

14   have done?

15   A    If she had come and Officer Vang was on a different call?

16   I would have just explained to her that Officer Vang had the

17   keys, so we can get the keys back to her, and then she can take

18   the vehicle.

19   Q    At some point did you receive a call from the jail?

20   A    Yes.

21   Q    What did they tell you?

22   A    So staff had called me and advised me they found, like, a

23   large amount of the white, crystal-like substance, which they

24   thought was meth.  They -- it was concealed on him.  They had

25   granted amnesty for him when I did not filling out the booking

1   card.  They also felt that there was more -- that -- more meth,

2   you know, concealed on him, and he had not yet turned it over,

3   so he was secured in a restraint chair, or something to that

4   effect of a restraint chair.

5   Q    Where were you when you received that call?

6   A    I was either one block west still watching the Escalade or

7   directly behind the Escalade.

8   Q    And had Ms. Kendhammer arrived at that point?

9   A    No.

10  Q    Did you make any decisions as a result of learning that the

11  jail had recovered suspected methamphetamine from Mr. Beeler?

12  A    Upon getting that phone call from jail, then we had -- I

13  had intended on performing an Act 79 search on his vehicle.

14  Q    Other than the information from the jail and the

15  nervousness you talked about earlier, were there any other facts

16  that led you to suspect that there would be drugs in the

17  vehicle?

18  A    Part of it was, like, just the phone call and his behavior

19  at jail -- not behavior I should say.  Just the statements that

20  he made at jail regarding the vehicle.  You know, trying to work

21  with a plan to just simply roll up the windows and lock it and

22  leave it is what we were hoping on doing initially.  Him just

23  insisting that she would be there, she would be there I thought

24  was a little odd.  And then, prior to that, just the nature of

25  the phone call with Ms. Kendhammer and Mr. Beeler was also odd

COLIN SHERDEN - DIRECT

```
1     to me as well considering her -- how stressed she was when

2     trying to ask those questions about where the vehicle was at and

3     trying to get it and why he was arrested.

4     Q    In your experience, compared to other traffic stops, was

5     Ms. Kendhammer unusually interested in the vehicle?

6     A    Yes.

7               MR. ZACHAR:  I'm going to object to relevance,

8     foundation.

9               THE COURT:  Can you rephrase it?

10    BY MS. STELLJES:

11    Q    How did Ms. Kendhammer's -- how did Ms. Kendhammer's end of

12    the conversation compare to other traffic stops?

13    A    Are you talking, like, when he first answered the phone?

14    Q    Yes.

15    A    To me, it seemed odd compared to different, like, traffic

16    stops or warrant arrests that I have done.  There's times with

17    people where they're saying they're going to jail, and it's just

18    simply, "Okay.  I'll bond you out," or, "I'll come get you."

19    It's not this stressed sound of trying to get the car, trying to

20    see where he's at.  So it's just to me the -- her tone, I guess,

21    and, I guess, the questions she was asking seemed primarily

22    fixated on the car and what he was doing.

23    Q    And then you also mentioned the conversations with

24    Mr. Beeler at the jail --

25    A    Yes.
```

COLIN SHERDEN - DIRECT

1    Q    -- correct?

2         What was suspicious about those conversations?

3    A    You know, we told him that we were behind the vehicle and

4    told him that we can try and secure it for him because she

5    hasn't yet arrived.  I offered up a plan of if we can just roll

6    up the windows, lock it, bring the keys back to you or even --

7    and then eventually also offered to roll up the windows and keep

8    the keys inside as a secondary plan, but he just kept

9    insinuating that, no, she'll be there, and it was just not

10   necessarily kind of trying to work with us to try and get a

11   solution so his vehicle can be secured.

12   Q    Earlier you said he mentioned when you were driving away

13   from the Escalade he wanted the windows rolled up, right?

14   A    Yes.

15   Q    And then you got to jail, and he said he won't authorize

16   anyone to roll up the windows, correct?

17   A    Initially, yes.

18   Q    What happened after you decided to search the car?

19   A    So after I decided to search the car, Ms. Kendhammer had

20   arrived.

21   Q    And what happened?

22   A    I spoke with her.  I asked her about Mr. Beeler, if he's

23   still using, referring to drugs, and she advised, "At least not

24   around me."  And she asked about if we were going to search the

25   car, and I advised her that we were.

COLIN SHERDEN - DIRECT

1    Q    Did a K-9 sniff the car?

2    A    Yes.

3    Q    What were the results of the dog sniff?

4    A    It did not have a positive alert.

5    Q    What role did the dog sniff play in your decision to search

6    the car?

7    A    So that was prior to finding out information that we --

8    after I had left from jail, but what initially wanted me to

9    deploy the dog was the nervous behaviors that I had seen with

10   him getting out of the car, the phone call, as well as being

11   aware of his drug history.

12   Q    But after the dog did not alert to the presence -- well,

13   did the dog alert to the presence of drugs?

14   A    No.

15   Q    Then you received the call from the jail about the drugs,

16   right?

17   A    After I had cleared from the jail, yes.

18   Q    So what did you deduce from that about the dog sniff?

19   A    Considering the jail said that it was a lot of a white,

20   crystal-like -- a lot of meth, like, the white, crystal-like

21   substance, and they felt there was more on him, I thought the

22   dog had missed.

23   Q    What did you find in the Escalade?

24   A    So after we did that Act 79 search, I found, like, a

25   baseball-sized chunk of what appeared to be meth.  It was a

COLIN SHERDEN - DIRECT

1    white, crystal-like substance.  It was sealed in, like -- it

2    appeared to be sealed and wrapped in plastic sitting on top of a

3    bucket of golf balls.

4    Q    (Inaudible) -- the call from the jail before Ms. Kendhammer

5    arrived at the Escalade, correct?

6    A    Yes.

7         MS. STELLJES:  I believe that's all my questions, but

8    if I could just have a few seconds to review my notes?

9         (Pause in proceedings.)

10   BY MS. STELLJES:

11   Q    Before your testimony today, did you review a time line

12   marked as Government Exhibit 5?

13   A    Yes.

14   Q    Did you review it for accuracy?

15   A    Yes.

16   Q    And did you have a few changes to earlier drafts?

17   A    Yes.

18   Q    And in its current form, is it accurate?

19   A    Yes, to the best of my knowledge.

20        MS. STELLJES:  No further questions.

21        THE COURT:  Your witness.

22        MR. ZACHAR:  Thank you.

23                    CROSS-EXAMINATION

24   BY MR. ZACHAR:

25   Q    So, Officer, when you initiated the traffic stop of

COLIN SHERDEN - CROSS

1    Mr. Beeler, you were in an unmarked neighborhood resource

2    officer vehicle?

3    A    Yes.

4    Q    And you initiated the traffic stop by activating your red

5    and blue emergency lights?

6    A    Yes.

7    Q    Mr. Beeler pulled over in response to that?

8    A    Yes, at 600 Car Street.

9    Q    Stopped his vehicle?

10    A    Yes.

11    Q    And when you were -- you know, at the time that you

12    initiated the traffic stop, you believed that he had an

13    apprehension request out for him from the Wisconsin Department

14    of Corrections, correct?

15    A    Yes.

16    Q    I think you testified on direct that he had a warrant.

17    We're talking about an apprehension request; is that correct?

18    A    Yes.  They'll come out as, like, a felony, like, probation

19    warrant.

20    Q    Now, as you're pulling over any individual, you're watching

21    the occupants of that vehicle, to the best of your ability, for

22    any suspicious behavior, right?

23    A    Yes.

24    Q    And you're looking particularly for furtive movements,

25    right?

1    A    Looking for furtive movements, if there's anything in plain

2    view, just trying to keep as aware as I can.

3    Q    Okay.  And you were watching Mr. Beeler, to the best of

4    your ability, to see whether or not he was trying to hide or

5    handle contraband, right?

6    A    Yes.

7    Q    You were watching him, to the best of your ability, to see

8    if he was trying to conceal or access a weapon, right?

9    A    Yes.

10   Q    And you didn't observe any of that behavior, those

11   furtive-type movements from Mr. Beeler in the course of the

12   traffic stop, correct?

13   A    Like a furtive movement like trying to lunge down in the

14   car, like moving around trying to conceal something?

15   Q    We'll start with that, yes.

16   A    Yeah.  I didn't see him -- anything that was overt of him

17   trying to move around -- or move around in the car.

18   Q    You didn't see him trying to conceal anything on his body

19   or in his clothing, right?

20   A    Not that I could see, no.

21   Q    You didn't see him trying to move or conceal contraband

22   within the vehicle; is that correct?

23   A    Not that I could see.

24   Q    And when you approached the vehicle, Mr. Beeler had rolled

25   down his driver's side window; is that correct?

COLIN SHERDEN - CROSS

```
 1    A    Yeah.  I believe it was either halfway rolled down -- but
 2    it was rolled down enough where I could hear him, and he could
 3    see me and hear me.
 4    Q    And you were able to look inside of the vehicle from that
 5    perspective, right?
 6    A    Yes.
 7    Q    And, obviously, if you had seen any contraband in plain
 8    view, you would have noted that, correct?
 9    A    If it was in plain view, yes.
10    Q    You didn't see any contraband in plain view inside of that
11    vehicle, correct?
12    A    Upon my initial approach, no.
13    Q    You did not detect the odor of any unlawful substances when
14    you approached the vehicle; is that correct?
15    A    No, I didn't smell any.
16    Q    And Mr. Beeler had a brief verbal exchange with you in the
17    vehicle, right?
18    A    I believe so.
19    Q    You told him to get out of the vehicle, right?
20    A    I advised him to step out, yeah.
21    Q    He did so?
22    A    Yes.
23    Q    And your intention at that point was to place him under
24    arrest for the apprehension request; is that correct?
25    A    Eventually, yes.
```

COLIN SHERDEN - CROSS

1    Q    Now, Mr. Beeler turned off the ignition to the Escalade; is

2    that correct?

3    A    Yes.

4    Q    He removed the keys from the ignition?

5    A    I believe so.

6    Q    And, as you testified, he placed those keys back inside of

7    the vehicle; is that correct?

8    A    He left the keys in the vehicle, yes.

9    Q    Did you see where in particular the keys were left in the

10   vehicle at that point?

11   A    Specifically, I don't recall, but I know it was inside the

12   vehicle.

13   Q    The keys were in plain view?

14   A    I don't remember if I saw them, but I think I could see his

15   hand where, like, he had motioned towards, like, the front of

16   the car.  Not like he, like, threw them back or nothing like

17   that.

18   Q    Okay.  Now, you agree that when Mr. Beeler gets out of the

19   vehicle, his phone starts ringing; is that correct?

20   A    Yes.

21   Q    And when he answers it, it's placed on speaker phone?

22   A    It was placed on speaker phone.

23   Q    And you were able to determine that the other person on the

24   phone call was Jennifer Kendhammer?

25   A    Yes.

1    Q    Now, during this time frame, she asks where the vehicle is

2    parked; is that correct?

3    A    (Inaudible) -- asked about that.  I said, "One second.  I'm

4    just trying to get this sorted out."  And that was, I think,

5    either just before he was in handcuffs or right after that, but

6    then eventually I advised that it was near Rose and Car Street.

7    Q    And you were advising her where the vehicle was because if

8    (inaudible) -- right?

9    A    Roughly, yes.

10   Q    (Inaudible) -- stop occurred is a residential area, right?

11   A    Yes.

12   Q    Lots of single-family homes, correct?

13   A    Single-family homes, rentals, duplexes, but yeah.

14   Q    Okay.  And you'd agree that there are drug arrests made in

15   every single area of La Crosse on a daily basis?

16   A    Maybe not on an daily basis, but there can be (inaudible).

17   There -- it has happened.  (Inaudible).

18   Q    This is the point in time when he takes his phone out where

19   you say that Mr. Beeler looked nervous to you; is that correct?

20   A    When he's taking his phone out, like, from his pocket?  Is

21   that what you're asking?

22   Q    Yes.

23   A    Yes.

24   Q    And your testimony was that his hand had a shake or a

25   quiver; is that correct?

1    A    Yeah.  I could see it as he's pulling it out, looked like

2    it was shaking.

3    Q    Okay.  And did you have a chance to review your body camera

4    footage before your testimony here?

5    A    Parts of it.

6    Q    Did you have a chance to review your body camera footage of

7    Mr. Beeler taking his phone out?

8    A    Yes.

9    Q    Would you agree with me that the quiver that's observed on

10   your body camera footage is very slight and of a very short

11   period of time?

12   A    It can be hard to tell to see strictly on the body camera

13   footage, but if the body camera footage shows it, then yes.

14   Q    Okay.  In other words, Mr. Beeler wasn't shaking so

15   uncontrollably that it was visible throughout the interaction,

16   correct?

17   A    Like, in terms of him, like, convulsing, like, the whole --

18   his whole body, he was not doing that, no.

19   Q    He was able to hang onto his cell phone, right?

20   A    Initially, yeah, and then he put it on the -- put it on my

21   squad car.

22   Q    Yeah.  And he was actually able to manipulate the phone and

23   turn it on to a speaker phone call, correct?

24   A    Yes.

25   Q    And he didn't drop the phone at any point before you took

COLIN SHERDEN - CROSS

1    him into custody, right?

2    A    No.

3    Q    You didn't hear his voice cracking or quivering as well?

4    A    Nothing that I could distinctly remember, no.

5    Q    He wasn't particularly sweaty that you observed, correct?

6    A    It was hot that day, so I don't know, like, the entirety of

7    his sweat, but nothing that was, like, super observant -- or

8    apparent, I should say.

9    Q    If it was something that you deemed to be out of the

10    ordinary, you would have reported that in your police report,

11    correct?

12    A    Yes.

13    Q    And fair to say that since it's not in your police report,

14    you didn't observe that with respect to Mr. Beeler?

15    A    In terms of abnormal sweating, no.

16    Q    Same thing with whether or not Mr. Beeler was unable to

17    have an ordinary conversation with his girlfriend; is that

18    correct?

19    A    Yes.

20    Q    Now, the total time frame that Mr. Beeler was out of the

21    car before you put him into handcuffs was about 50 seconds.  Do

22    you agree with me roughly on that figure?

23    A    It was relatively quick from the time he stepped out to

24    when he was put in handcuffs, so I'd say that's about right.

25    Q    All right.  And when you told Mr. Beeler to put his hands

1    behind his back, he did so?

2    A    Yes.

3    Q    He didn't resist or obstruct you, right?

4    A    Correct.

5    Q    And you handcuffed him behind his back?

6    A    Yes.

7    Q    You searched his person?

8    A    Yes.

9    Q    You discovered no contraband in that search of his person;

10   is that correct?

11   A    In the pockets or in the waistband, correct.

12   Q    You told Mr. Beeler that he was being taken into custody on

13   this apprehension request?

14   A    Yes.

15   Q    And --

16   A    How I described it was a probation warrant.

17   Q    Sure.  And then you placed him in the back of your locked

18   squad car; is that correct?

19   A    It was the back of my squad car.  I'm not entirely sure if

20   I locked it or not, but he was placed back there, and the door

21   was closed.

22   Q    It would be your ordinary practice to ensure that the back

23   of your squad car was locked if you had a suspect who was in

24   custody back there, correct?

25   A    Yeah.  With the squad cars, there's no way he'd be able to

COLIN SHERDEN - CROSS

1    open the doors since there's not a door handle, but I didn't hit

2    the lock button on the front of our squad car.

3    Q    So, in other words, it was locked to Mr. Beeler being able

4    to let himself out of the squad car?

5    A    Yes.

6    Q    All right.  So the phone is still on speaker for a part of

7    this interaction while you're arresting Mr. Beeler; is that

8    correct?

9    A    Yes.  Are you talking when he's in handcuffs?

10   Q    Yes.

11   A    Yes.

12   Q    And you have a chance to speak with Ms. Kendhammer during

13   that phone call; is that correct?

14   A    Yes.

15   Q    And her words to you was whether or not she could come and

16   pick up the vehicle right now, as she put it; is that correct?

17   A    I believe so.

18   Q    Now, you described Ms. Kendhammer as sounding somewhat

19   stressed.  Is that your direct testimony?

20   A    Yes.

21   Q    And Ms. Kendhammer was visibly pregnant when she eventually

22   showed up on scene, right?

23   A    Yes.  I believe he had advised me at the jail that they

24   were expecting, so that's where I was able to deduct that she

25   was pregnant.

1    Q    Well, you were able to see her condition when you

2    watched -- reviewed your body camera, right?

3    A    Her condition?

4    Q    She appeared to be visibly pregnant, right?

5    A    Oh, yes.

6    Q    All right.  And you learned in the course of this

7    conversation that there were a large number of tools inside of

8    this Escalade; is that correct?

9    A    Yes.

10    Q    And, in fact, you later documented in an inventory search a

11    large number of tools inside of the Escalade; is that correct?

12    A    Yes.

13    Q    And Mr. Beeler actually advised you that he was a

14    professional tree trimmer or arborist, I guess?

15    A    I'm not sure when he told me that, but I think he made

16    mention of Bee's Trees possibly being his employment.

17    Q    Okay.  And that was something Ms. Kendhammer specifically

18    said to you, that there were thousands of dollars of tools

19    inside of that vehicle; is that correct?

20    A    I don't know if she gave a number, but there was tools in

21    the vehicle, yeah.

22    Q    Now, you told Ms. Kendhammer during this initial

23    conversation on the phone that if everything was okay with the

24    vehicle, that you would release it back to her; is that correct?

25    A    Yes.

1    Q    And before you departed, you met with Officer Vang and

2    talked to him briefly on scene?

3    A    Yes.  Outside of my squad car?

4    Q    Yes.

5    A    Yeah.

6    Q    And you told Officer Vang that Mr. Beeler wanted

7    Ms. Kendhammer to access the vehicle and take it from the scene?

8    A    Yes.

9    Q    So prior to leaving, you contacted Officer Steve Hughes of

10   the La Crosse Police Department?

11   A    Yes.

12   Q    And Officer Hughes is a K-9 handler for the La Crosse

13   Police Department?

14   A    Yes.

15   Q    And his K-9's name is Zeus; is that correct?

16   A    Yes.

17   Q    And Zeus is a K-9 that you've called for service in the

18   past; is that correct?

19   A    I think I've called for him a couple of times.

20   Q    Zeus is a certified police K-9 to your knowledge?

21   A    To my knowledge, yes.

22   Q    And is trained in the detection of illegal drugs?

23   A    Yes.

24   Q    And that's the reason that you called for Zeus, to see

25   whether or not the police K-9 would alert to an open air sniff

1    of the -- around the vehicle; is that correct?

2    A    Yes.

3    Q    And to your knowledge, Sergeant Hughes did have Zeus

4    conduct an open air sniff around the Escalade?

5    A    Are you talking about Officer Steve Hughes?

6    Q    Yes.

7    A    Yes.  Yeah, he did -- to my -- I requested him to do an

8    open air sniff around the Escalade.

9    Q    And to your knowledge, Officer Hughes did so?

10   A    Yes.

11   Q    And Officer Hughes reported back to you that Zeus did not

12   alert to the presence of controlled substances?

13   A    Yes.  I was aware there was not a positive alert.

14   Q    Now, at that point when the K-9 didn't alert, was it your

15   intention to have the vehicle released to Ms. Kendhammer?

16   A    Which point in time are you talking about?  Like, right

17   after it was done, and Officer Hughes left, and Vang is with the

18   car?

19   Q    Yes.

20   A    Yes.  My intention was to have that get released to her.

21   Q    So I want to talk a little bit about your conversation with

22   Mr. Beeler at the jail.

23        So I had at -- and the government's outline as well has

24   that at 2:01 -- or 12:01 p.m. you receive a -- or you receive a

25   call from Officer Vang while you're at the jail with Mr. Beeler?

COLIN SHERDEN - CROSS

1    A    Yes.  Was that to the desk phone or to my work phone?

2    Q    I believe that was to the desk phone.

3    A    From the -- the prebooking area?

4    Q    Yes.

5    A    Yes.

6    Q    And just to paint the scene here, you're in the booking

7    area of the jail.  There's a desk that officers can use to enter

8    information on a booking card, right?

9    A    Yes.

10   Q    That's where you were seated?

11   A    Yes.

12   Q    And you receive a phone call at the desk from Officer Vang?

13   A    Yes.

14   Q    And Officer Vang tells you that he wants to leave the scene

15   to go to another call; is that correct?

16   A    I don't know if he wanted to leave or just that there's

17   another call that he had to go to, but there was a discussion

18   about another call.

19   Q    So during that time frame, you asked Mr. Beeler what he'd

20   like done with the Escalade, correct?

21   A    Yes.

22   Q    And you asked him specifically if he would like the vehicle

23   locked and have the keys brought to him; is that correct?

24   A    I think I gave a couple different answers.  I'm trying to

25   remember, because there was multiple phone calls that we -- or

COLIN SHERDEN - CROSS

1    two phone calls that we had, but I know that I had offered up

2    like, hey, we can take the keys, roll it up, get the keys back

3    to you at jail, and then I think there was a couple other

4    options about whether it's keys are in there or with the windows

5    being up, if that makes sense.

6    Q    So Mr. Beeler rejected the offer of having the vehicle

7    locked and the keys brought to the jail; is that correct?

8    A    Yes.

9    Q    And the offer that you made to him after that point was

10   securing the vehicle and leaving the keys with the vehicle

11   unlocked for Ms. Kendhammer; is that correct?

12   A    Eventually, that was, I think, maybe the last offer that I

13   had, yeah.

14   Q    And that was the offer that Mr. Beeler said that he would

15   like to go with; is that correct?

16   A    I believe so, yes.

17   Q    And that was the intent, to leave the keys with the

18   vehicle, the vehicle unlocked, so Ms. Kendhammer could retrieve

19   it or retrieve the property in it?

20   A    Yes.  I was under the impression initially with Officer

21   Vang being there that that's how the vehicle stayed, so then if

22   he had to go to a different call, I wanted to clarify that

23   that's what Mr. Beeler wanted done.

24        So -- and your question was initially the intent was to

25   keep the vehicle unlocked for Ms. Kendhammer to arrive?  Is that

COLIN SHERDEN - CROSS

1    what you had asked?

2    Q    That was the intention following that conversation with

3    Mr. Beeler; is that correct?

4    A    Yes.

5    Q    All right.  So you radio Officer Vang at about 12:06 p.m.;

6    is that correct?

7    A    Yes.

8    Q    And 41, is that your radio sign?

9    A    It was then, yes.

10   Q    Okay.  And 42 was Officer Vang?

11   A    Yes.

12   Q    And you radio Officer Vang, "41 to 42.  He said you can

13   leave the car where it's at"; is that correct?

14   A    Yes.

15   Q    And that was your last instruction to Officer Vang

16   regarding the vehicle; is that correct?

17   A    Yes.

18   Q    At this point you were unaware, I assume, that Officer Vang

19   had already entered the vehicle and removed the keys from it?

20   A    Yeah.  I was not aware of that.

21   Q    Now, at no point, Officer -- or, Sergeant Sherden, do you

22   tell Officer Vang that Ms. Kendhammer is not coming to get the

23   car; is that correct?

24   A    Can you rephrase the question again?

25   Q    At any point did you tell Officer Vang that Ms. Kendhammer

1    had told you she was not coming to pick up the car?

2    A    Like, explicitly, "No, I'm not coming"?  I did not -- no, I

3    did not say that.  Just that she was coming from Holmen.  I

4    believe I said that.

5    Q    And Holmen is also a city -- or a village, I guess, of

6    10,000 people?

7    A    Yeah.

8    Q    And you mentioned, I think, coming from Holmen to that side

9    of La Crosse could take anywhere from 15 -- I would say -- would

10   you disagree with me if I said that it could take up to 25

11   minutes?

12   A    Depends on traffic, but, yeah, I'd say 15 to 25.

13   Q    All right.  Now, you never told Officer Vang to seize the

14   keys to this vehicle; is that correct?

15   A    Correct.

16   Q    And you never told Officer Vang to lock the vehicle up; is

17   that correct?

18   A    Yes.

19   Q    So you testified on direct that -- as to some of your

20   rationale for this Act 79 search.  And we don't have a record of

21   the phone call from the jail deputy as to when that came in

22   about their discovery in the jail, correct?

23   A    Yes.

24   Q    And you mentioned that the jail gave him amnesty for

25   suspected methamphetamine that was found in his underwear

COLIN SHERDEN - CROSS

1    apparently, right?

2    A    So I had denied him amnesty, but then I think in order to

3    get it, the jail granted him amnesty and then felt that there

4    was more meth still concealed inside of him or on him.

5    Q    And that was Deputy Shane Sommerfeldt that you spoke with?

6    A    I don't remember who the jailer was.

7    Q    So do you recall exactly when that phone call would have

8    come in to your work cell?

9    A    The exact time, no, I do not.

10    Q    Sometime after you arrived back on scene though from what

11    we're looking at on the time line; is that correct?

12    A    So when I cleared from jail, I went back up to the

13    Escalade, and sometime between that time is when (inaudible).

14    Q    (Inaudible) -- correct?

15    A    Yes.

16    Q    (Inaudible) details or modification, you have the ability

17    to issue a supplemental report as well; is that correct?

18    A    I could, yes.

19    Q    Your police reports are actually reviewed by supervising

20    officers and signed off on; is that correct?

21    A    Yes.

22    Q    And did you follow the ordinary process for authoring a

23    police report in this case?

24    A    In terms of, like, just having a report dictated and trying

25    to review it and sending it through?

COLIN SHERDEN - CROSS

1    Q    Yes.

2    A    Yes.

3    Q    Do you agree that the contents of a police report should be

4    thorough, accurate, and complete?

5    A    To the best of my ability, yes.

6    Q    And to the best of your knowledge, are the contents of your

7    police report documenting the initial stop and Act 79 search

8    thorough, accurate, and complete?

9    A    To the best of my ability, yes.

10   Q    Now, your testimony on direct examination was that you felt

11   Ms. Kendhammer's reactions on the telephone were suspicious,

12   right?

13   A    Sounded stressed, right.

14   Q    You felt that it was suspicious that Mr. Beeler asked to

15   have the windows rolled up -- or made the comment about rolling

16   up the windows of the vehicle?

17   A    I just thought initially it was odd and just maybe worth

18   noting what he had said.

19   Q    And you thought that it was suspicious or odd that he made

20   these comments about Ms. Kendhammer coming to pick up the

21   Escalade while he was at the jail; is that correct?

22   A    When trying to come up with a plan to properly secure it?

23   Q    Yes.

24   A    Yes.

25   Q    You agree that you documented your rationale for the Act 79

1    search in your police report?

2    A    Yes.

3    Q    And that police report did not include as rationale your

4    belief that Ms. Kendhammer sounded stressed; is that correct?

5    A    I said nervous behaviors, so that was meant to also

6    incorporate her stressfulness on the phone, which is why I

7    included that in my initial contact, but also the hand shaking.

8    Q    Well, what you said was -- and if you don't recall this,

9    let me know -- but what you said on your report was, "Based off

10   the information obtained from jail that he had more substance

11   concealed on him and his nervous behaviors in getting out of the

12   car, I went back to the vehicle where it was stopped," end

13   quote.

14       Does that appear to be a quote you authored in your police

15   report?

16   A    Yes.

17   Q    And that was the rationale that you listed for the Act 79

18   search, correct?

19   A    The nervous behaviors, but also leading up to that and

20   thinking about it was what was going on with the phone

21   conversation.  That was just a small part of the picture, which

22   is why I included it in the report.

23   Q    Well, I'm just asking you the comment about Ms. Kendhammer

24   sounding stressed, that's nowhere in your rationale in your

25   police report for the Act 79 search; is that correct?

COLIN SHERDEN - CROSS

1    A    That's included in the description of his behavior.

2    Q    You're including that in Mr. Beeler's behavior?

3    A    Sorry.  That is included in the, like, the initial contact

4    where it shows with the hand shaking and then the stressful

5    phone call.  But in terms of that explicit sentence, it is not

6    said in there.

7    Q    You agree that in your rationale for the Act 79 search, you

8    do not include Mr. Beeler's comment about, you know, wishing

9    that he had rolled his windows up; is that correct?

10   A    The reason I included that in the report was because I

11   thought it was odd and suspicious with, you know, taking him to

12   jail.

13   Q    It's not in your rationale for the Act 79 search; is

14   that --

15   A    I don't have a -- like, I don't have an explicit heading

16   (inaudible) odd and suspicious to me.

17   Q    Now, you said that you were generally aware of Mr. Beeler's

18   criminal history; is that correct?

19   A    Yes.

20   Q    Fair to assume that you weren't aware of the specifics --

21   the specific factual basis leading to his conviction for which

22   he was on supervision as of August 30th of 2024?

23   A    What do you mean?  Like, the factual -- like, the

24   entirety of the investigation --

25   Q    The facts leading to his conviction, yes.

1    A    -- or what he was convicted for?

2    Q    The facts that led to his prosecution and conviction.

3    A    The facts that led to it, no, I wasn't aware of that

4    entirely.

5    Q    You knew simply that he had been convicted of a felony

6    drug-related offense, correct?

7    A    Yes.

8    Q    Now, your understanding is that, I guess unbeknownst to

9    you, is that at some point while Officer Vang was still on the

10   scene, he removed the keys from the vehicle?

11   A    Can you rephrase that question again?

12   Q    Your understanding is that Officer Vang had removed the

13   keys from the vehicle, from the Escalade?

14   A    Are you talking my understanding now or, like, prior to

15   when that happened?

16   Q    Your understanding now.

17   A    Now, yes.

18   Q    And that he locked the vehicle?

19   A    Yes.

20   Q    And maintained possession of those keys?

21   A    He had the keys after he had done that, yes.

22   Q    And you had to wait for Officer Vang to return before you

23   were able to access the vehicle; is that correct?

24   A    Yes.

25   Q    And that was after Ms. Kendhammer had already arrived on

1   scene; is that correct?

2   A    So Ms. Kendhammer arrived.  I explained to her our

3   intention on searching it based off of, like, for the Act 79,

4   and then she left.  Then Officer Vang arrived a couple minutes

5   later.

6   Q    You made it clear to Ms. Kendhammer that she would not be

7   getting the vehicle back immediately because you would be

8   searching it; is that correct?

9   A    Yes.

10  Q    And at the time of the search, you knew at that point that

11  Zeus had not alerted to the presence of controlled substances,

12  right?

13  A    Yes.

14  Q    You had no reason to believe that anyone had accessed the

15  vehicle in the meantime to tamper with evidence inside of it; is

16  that correct?

17  A    Yes.

18  Q    And would you agree with me if I said that the suspected

19  methamphetamine in the bowl of golf balls was located about 1:16

20  p.m.?

21  A    Yes.  Because what time did we search the car?  1:06

22  roughly?

23  Q    Your time line, I believe, says that you began at about

24  1:06 p.m.  Does that sound correct?

25  A    Yeah.

1    Q    Now, Sergeant, the sole rationale for the search of the

2    vehicle resulting in the seizure of this methamphetamine was

3    pursuant to Act 79, correct?

4    A    Yes.

5    Q    And at no point did you pursue or obtain a search warrant

6    to search that vehicle?

7    A    No, I did not have a search warrant.

8    Q    At the time of the search, Mr. Beeler was confined in the

9    La Crosse County Jail?

10   A    Yes.

11   Q    And you would agree that Mr. Beeler had no practical way of

12   accessing the Escalade or manipulating its contents from inside

13   of the jail?

14   A    Like, him driving it or with the keys, no.  He didn't have

15   the keys and couldn't physically drive it.

16        MR. ZACHAR:  Just give me one moment, Your Honor.

17        THE COURT:  Yes.

18   (Pause in proceedings.)

19        MR. ZACHAR:  I have nothing further.  Thank you.

20                    REDIRECT EXAMINATION

21   BY MS. STELLJES:

22   Q    Who arrived at the Escalade first, Vang or Kendhammer?

23   A    Which --

24   Q    After Beeler was taken to jail.

25   A    So when Beeler was taken to jail, Officer Vang was there.

1    So he arrived before her.

2    Q    So both you and Officer Vang were with the Escalade before

3    Kendhammer got there, correct?

4    A    Yes.

5    Q    And before you got there, you knew about the drugs at the

6    jail -- or before she got there, you knew about the drugs at the

7    jail?

8    A    Before she got there, I knew -- I received a phone call

9    from jail that he had drugs.

10            MS. STELLJES:  No further questions.

11            THE COURT:  I have a few questions for Officer Sherden,

12    and then I'll allow both attorneys to come back at him if my

13    questioning incites further thoughts.

14        So thank you for being here, Sergeant Sherden.

15        You mentioned that you originally stopped Mr. Beeler

16    because of an apprehension order.  When you see that

17    apprehension order, what does it look like to you, and what

18    information do you get from it?

19            THE WITNESS:  So on our computer, it will show, like,

20    felony -- I think for this one it was felony full extradition,

21    and it will have Tyler's information, his name, birthday.  I

22    believe it will have the agency that it would be, so it would

23    be, like, the Department of Corrections, Probation and Parole,

24    and then, like, the date of the warrant being issued.  So it

25    pops up with, like, the entirety of that he has a warrant that

COLIN SHERDEN - REDIRECT

1    we could act on.

2         THE COURT:  So when you saw the apprehension order for

3    Mr. Beeler in this particular instance, you knew that it was for

4    a felony that was outstanding?

5         THE WITNESS:  Yes, because it would show felony full

6    extradition or fully extraditable at the top, just something

7    listed up top saying felony.

8         THE COURT:  So at that point you knew that there was a

9    felony charged and the arrest warrant was for that particular

10   reason?

11        THE WITNESS:  It was, like, a felony probation warrant.

12        THE COURT:  You didn't know at that point that it was

13   related to drugs?

14        THE WITNESS:  No.

15        THE COURT:  You mentioned the dog sniff and that the

16   dog did not alert to --

17        THE WITNESS:  Right.

18        THE COURT:  -- controlled substances in the vehicle.

19     How was that information communicated to you?

20        THE WITNESS:  I think it was either through the

21   computer or through, I think, the phone call at jail.  I'm not

22   entirely sure, but I just knew that the dog did not hit.  It was

23   communicated probably one of those two ways.

24        THE COURT:  So I see in your time line --

25        THE WITNESS:  Uh-huh.

1          THE COURT:  -- this is the Government's Exhibit 5 --

2     and I'm just counting the bullet points, so the fifth bullet

3     point says, "At 11:53 a.m., a K-9 sniffs Escalade and does not

4     alert to the presence of contraband."

5          So that alert, or lack of alert, would have been

6     communicated to you after that moment, after 11:53?

7          THE WITNESS:  Yes.

8          THE COURT:  And then it says a minute later, at 11:54,

9     that is when you arrived at jail with Mr. Beeler; is that right?

10          THE WITNESS:  Yes.

11          THE COURT:  So you would have received the nonalert

12     information essentially simultaneously when you were getting to

13     the jail?

14          THE WITNESS:  No.  That I don't recall if it was,

15     like -- and, again, if that was, like, specifically when I was

16     arriving at the jail, but I know that I was eventually made

17     aware that the dog did not alert.  I think that was prior to

18     leaving the jail.  I was told that sometime.  It might have been

19     during the phone call initially, but I honestly can't remember

20     exactly when I was told.

21          THE COURT:  To the best of your recollection, were you

22     informed about the dog's nonalert before you made it back to the

23     Escalade after clearing from the jail?

24          THE WITNESS:  I believe so, yes.

25          THE COURT:  And it was either communicated to you

1     through a call or through your computer.

2           THE WITNESS:  Potentially.  So, in general, there are

3     times where, like, if a K-9 handler will have like -- let's say

4     a positive alert.  They will sometimes say it on the radio, and

5     our dispatcher will note it.  In this instance, I'm not sure,

6     because I didn't have one, if that was communicated on our

7     computer, which updates it, or if it was through a phone call,

8     but I just know that -- I just know that the dog did not alert

9     on the car.

10          THE COURT:  And the dog had cleared from the car by the

11    time you had gone back there?

12          THE WITNESS:  Yes.

13          THE COURT:  When you were heading back to the Escalade,

14    that is when you received a call from the jail about the

15    suspected methamphetamine that was recovered from Mr. Beeler

16    during processing; is that right?

17          THE WITNESS:  So I think I was already at the Esca --

18    (inaudible) -- the report or, like, the phone call?

19          THE COURT:  (Inaudible) -- from the jailer.

20          THE WITNESS:  So the phone call from the jailer, I

21    think there's just, like, a lot of the white, crystal-like

22    substance, which they believed to be -- was meth.  I don't

23    remember the exact details of how it happened, and then I

24    believe I was told they got that because they had granted him

25    amnesty, despite me denying him amnesty, and then they made

1   mention that he may have more on him, so he was secured down

2   in -- maybe it was a restraint chair, some sort of chair, and

3   they were going to try and retrieve more that he had on him.

4        THE COURT:  When you say that you "denied him amnesty,"

5   what do you mean?

6        THE WITNESS:  So there is a -- we have an orange

7   booking card -- it's different now because it's all on the

8   computer -- but an orange booking card.  We'll fill out, like,

9   the case number; his information, like birthday, address; what

10   the charge is or what the warrant is; and, like, basic questions

11   for the jail, so, like, if he takes prescription medication or

12   if he was read his rights prior to entering.  And then you can

13   also do a tab on denying someone amnesty.  So it's just -- it's

14   a quick box that you would check.

15        THE COURT:  Why did you deny him amnesty?

16        THE WITNESS:  That's something that I normally do with

17   each person that I arrest.  It's something that I, in general,

18   will just mark down for each person that comes in.

19        THE COURT:  So sort of standard practice for you to say

20   no?

21        THE WITNESS:  Sort of standard, yes.

22        THE COURT:  It wasn't based on any particular knowledge

23   at that time that you thought he might have drugs and you didn't

24   want to grant him the amnesty for any controlled substance that

25   might be on his person at the time?  It was just a check of that

1    box in the moment?

2            THE WITNESS:  Correct.  And if someone -- if I had,

3    like, you know, something that would lead me to think that he

4    would be concealing drugs, in general I try to, like, let jail

5    staff know, hey, this is what I observed and just letting you

6    know.  That's happened in the past where I've just informed

7    them.  But for this, it was just because I just marked it down

8    on the sheet.

9            THE COURT:  So then based on what you understood from

10   the jail -- so you had left him at the jail.  At that point you

11   hadn't seen any controlled substances on his person, but then

12   they called you and told you that they found suspected

13   methamphetamine.

14           THE WITNESS:  Yes.

15           THE COURT:  And that they thought that there was more.

16           THE WITNESS:  Yes.

17           THE COURT:  And that he was being put in a restraint to

18   wait out what they thought would be more recovered from his

19   person?

20           THE WITNESS:  Something to that effect, yes.

21           THE COURT:  When they told you that he had been put

22   into a restraint chair, what did that indicate to you?

23           THE WITNESS:  To me -- they didn't explicitly say what

24   the chair was, but to me it's just that he was secured down --

25   secured down in a chair, and they were just trying to wait until

1   the substance was retrieved.

2           THE COURT:  What are the circumstances that the jail

3   uses this restraint chair?

4           THE WITNESS:  That I'm not sure.

5           THE COURT:  Okay.  Okay.  Thank you, Sergeant Sherden.

6   I'll turn it back now, and we'll go in the same order.  So,

7   Attorney Stelljes, if you'd like to do any follow-up

8   questioning, I'll allow that.

9           MS. STELLJES:  Just one.

10                      REDIRECT EXAMINATION

11  BY MS. STELLJES:

12  Q    You testified that you returned to the Escalade before you

13  received the call from the jail, correct?

14  A    Yes.

15  Q    What was your purpose in returning to the Escalade at that

16  point?

17  A    Just to keep eyes on the vehicle.  That was in case

18  Ms. Kendhammer had arrived, and then we could have it turned

19  over to her or, since when I got there I saw that it was locked,

20  just that I can explain to her, hey, Officer Vang has the keys,

21  he's going to finish up with this call or whatever, and then try

22  and get the car back to her.

23          MS. STELLJES:  No further questions.

24          MR. ZACHAR:  Thank you.

25

COLIN SHERDEN - REDIRECT

```
1                          RECROSS-EXAMINATION
2    BY MR. ZACHAR:
3    Q    Sergeant, is it fair to assume that you would have been
4    aware of the negative K-9 sniff alert when you were discussing
5    authorizing the vehicle being released around 12:01 p.m.?
6    A    Is that when I'm outside the jail?
7    Q    Inside of the jail when you're talking about releasing the
8    vehicle to Ms. Kendhammer.
9    A    Oh, yes.  Yep.
10   Q    Yeah.  So you wouldn't have released -- or you wouldn't
11   have planned to release the vehicle unless you knew that the K-9
12   did not alert, right?
13   A    Yes.
14            MR. ZACHAR:  All right.  That's all I have.
15            THE COURT:  Can you ask that question one more time?  I
16   got confused with the double negatives.
17            MR. ZACHAR:  Sure.  I think I confused myself, Your
18   Honor, so.
19   BY MR. ZACHAR:
20   Q    Would you have released the vehicle if you were unaware of
21   the results of the dog sniff at that point?
22   A    I would not have released the vehicle unless I knew what
23   the results of the dog sniff were.  Does that answer --
24   Q    Yes.
25   A    Okay.
```

1           MR. ZACHAR:  Thank you.

2                    REDIRECT EXAMINATION

3    BY MS. STELLJES:

4    Q    Just to clarify on that, you wouldn't have released the

5    vehicle if the dog had alerted to the presence of controlled

6    substances, right?

7    A    Right.

8    Q    But what would have happened if Ms. Kendhammer had arrived

9    before the dog sniff even was completed?

10   A    We would have still done the exterior sniff of the vehicle.

11   Q    What if she was there 30 seconds after the call -- after

12   you were there with the keys in hand ready to --

13   A    So if we --

14   Q    -- take Mr. Beeler to jail?

15   A    If we had the K-9 sniff done and --

16   Q    No.  My question is what would have happened if

17   Ms. Kendhammer would have arrived before the K-9 arrived?

18   A    That's something that we didn't really discuss, but at that

19   point I felt we had enough to at least run a dog around the car,

20   so we would have waited until the sniff was done.

21           MS. STELLJES:  Okay.  No further questions.

22           MR. ZACHAR:  Nothing else, Your Honor.

23           THE COURT:  Okay.  Then you are excused.  Thank you.

24           THE WITNESS:  Thank you.

25       (Witness excused at 12:47 p.m.)

COLIN SHERDEN - REDIRECT

1          MS. STELLJES:  The government calls Officer Alex Vang.

2      May I leave a copy of the time line on the witness stand in

3      the meantime, Exhibit 5?

4              THE COURT:  Are you hoping to go over that with him?

5              MS. STELLJES:  Possibly.

6              MR. ZACHAR:  Yeah.  No objection.

7              THE COURT:  Okay.

8                  **ALEX VANG, GOVERNMENT'S WITNESS, SWORN**

9                          <u>DIRECT EXAMINATION</u>

10     <u>BY MS. STELLJES:</u>

11     Q    Good morning.  Would you please state and spell your name

12     for the record.

13     A    Yes.  Officer Alex Vang, A-L-E-X, V like Victor, A-N-G.

14     Q    Where are you employed?

15     A    With the City of LaCrosse Police Department.

16     Q    What's your title?

17     A    I'm a police officer.

18     Q    How long have you worked for the La Crosse Police

19     Department?

20     A    About ten years.

21     Q    I want to direct your attention to August 30th, 2024.  Did

22     you receive a call for backup on that date from Officer Sherden?

23     A    I did.

24     Q    What did you do in response to that call?

25     A    So I responded to assist him with taking a party into

1    custody.  When I got there, he'd already taken the party into

2    custody.

3    Q    What was your role?

4    A    My role was to stand by with the vehicle.  I was advised by

5    Officer Sherden that a K-9 officer was en route to sniff the

6    vehicle, and I was to stand by and wait for a party to come and

7    pick up the vehicle.

8    Q    Did you know who that party was?

9    A    Yeah.  So it was Jennifer Kendhammer.

10   Q    Did Ms. Kendhammer show up right away?

11   A    She did not.

12   Q    What did you do?

13   A    So after the K-9 officer sniffed the vehicle, there was no

14   positive alert.  I stood by with the vehicle.  At the same time

15   there was another call that came up where another officer needed

16   assistance with taking a party into custody nearby.

17   Q    (Inaudible) -- that other call?

18   A    Just right around the corner at 303 Rose Street.

19   Q    Just a couple minutes away?

20   A    Less than a minute.

21   Q    What did you do next?

22   A    So I went to the vehicle.  I locked up the -- I rolled up

23   the windows, took the car keys and locked up the car, and

24   proceeded towards this other call to assist the officer.

25   Q    Why did you roll up the windows and lock the car?

1    A    To make sure that the vehicle was protected, that it's not

2    going to be stolen or have any of its property stolen from the

3    vehicle.

4    Q    Were you planning to return and search it later?

5    A    No.

6    Q    After you locked the vehicle, what did you do next?

7    A    I proceeded towards this other call, and then I asked

8    Officer Sherden about the status of this person that was coming

9    to pick up the car.  I was advised that she was going to be a

10   few minutes.

11   Q    What did you do in response to that?

12   A    I then turned around and went back to the car and sat

13   behind it.

14   Q    So you actually delayed your response to the call on 303

15   Rose Street --

16   A    Yes.

17   Q    -- to wait with the Escalade, correct?

18   A    Yes.

19   Q    What did you do to prepare for your testimony today?

20   A    I reviewed my report, and I also looked at body-worn

21   cameras.

22   Q    Okay.  And did you notice anything that required correction

23   in your report?

24   A    Yeah.  On my supplemental report, without viewing any

25   video, I recalled the incident to the best of my recollection,

1    and I noted that I made mention that Officer Sherden had told me

2    that the party was not coming anymore.

3    Q    And is that correct?

4    A    That's not correct.

5    Q    Having reviewed the body-worn camera, what is correct?

6    A    That she was going to be a few minutes.

7    Q    Okay.  When did you write the report?

8    A    In December of 2024.

9    Q    And you wrote it based on the best recollection you had of

10   that incident?

11   A    Yes.

12   Q    But the call itself took place in August, correct?

13   A    Correct.

14   Q    And -- strike that.

15        Okay.  So you returned to the vehicle and waited a few more

16   minutes for Ms. Kendhammer, correct?

17   A    Yes.

18   Q    Did she show up?

19   A    She did not.

20   Q    So what did you do?

21   A    So the officer needed assistance.  There was nobody else

22   available, and he was close by, so I asked Officer Sherden again

23   the status of this person, and I was advised to -- by Officer

24   Sheridan to just leave the vehicle there.

25   Q    Did you receive any information from Officer Sherden about

1    whether you should lock the vehicle or leave it unlocked?

2    A    I did not.

3    Q    He just said leave it where it's at?

4    A    Leave it where it is.

5    Q    Did you respond to the other call on Rose Street?

6    A    I did.

7    Q    What did you do after that call wrapped up?

8    A    So after the call wrapped up, I gave the keys to Officer

9    Jarrett, who was the officer that took the other party into

10   custody, to take to the jail to give to Officer Sherden.  But I

11   learned that Officer Sherden was en route back to the Escalade,

12   so I went back and retrieved the keys from Officer Jarrett to

13   give to Officer Sheridan.

14   Q    So you went back to the Escalade and handed Sherden the

15   keys?

16   A    Yes, I did.

17   Q    Was Ms. Kendhammer there when that happened?

18   A    She was not at the time I was there.

19   Q    Did you ever learn that -- did you ever learn that

20   Mr. Beeler was wanting the vehicle unlocked?

21   A    I never learned of that, no.

22   Q    And when you left for the call on Rose Street, did you take

23   the keys with you?

24   A    I did.

25   Q    Why?

ALEX VANG - DIRECT

1    A    For security purposes so that I have it in my possession,

2    that nobody can open the door or gain access to it.

3    Q    And if Ms. Kendhammer had gotten there sooner and had

4    arrived, what would you have done?

5    A    I would have given the keys to her and handed the car to

6    her.

7    Q    And, again, you were less than a minute away?

8    A    Yes.

9         MS. STELLJES:  No further questions.

10        THE COURT:  Your witness.

11        MR. ZACHAR:  Okay.  Thank you.

12                    CROSS-EXAMINATION

13   BY MR. ZACHAR:

14   Q    Officer Vang, you were present for the open air sniff of

15   the vehicle by Officer Steve Hughes and his K-9 partner Zeus?

16   A    I was, yes.

17   Q    And you recorded part of that on your body-worn camera,

18   correct?

19   A    Yes.

20   Q    And you agree that Zeus did not alert to the presence of

21   controlled substances in the course of this sniff; is that

22   correct?

23   A    Correct.

24   Q    Now, at the conclusion of that sniff when Zeus had not

25   alerted, it was your intention to release the vehicle to

1    Ms. Kendhammer; is that correct?

2    A    Yes, sir.

3    Q    And it appears that your body-worn camera was not on for a

4    large segment of your involvement in this particular stop; is

5    that correct?

6    A    Yes.

7    Q    It looks like you recorded just a portion of Zeus's sniff

8    of the vehicle, right?

9    A    Yes, sir.

10   Q    Now, thank you for correcting your report.  Do you agree

11   that at no point did Officer Sherden tell you that

12   Ms. Kendhammer was no longer coming to pick up the car, correct?

13   A    Correct.

14   Q    Now, you did speak with him -- with Officer Sherden at

15   least twice about what to do with this vehicle; is that correct?

16   A    Yes.

17   Q    Because you needed to get to another call, right?

18   A    Yes, sir.

19   Q    And at no point did Officer Sherden tell you to lock the

20   vehicle, right?

21   A    He did not, no.

22   Q    And you agree that if a vehicle is locked, you're not going

23   to be able to access it without the keys, correct?

24   A    Correct.

25   Q    Nobody gave you permission to enter that vehicle and take

ALEX VANG - CROSS

1    the keys; is that correct?

2    A    Nobody did, no.

3    Q    Now, you agree that you opened the front door to the

4    Escalade and removed the keys from inside of the vehicle?

5    A    Say that again?

6    Q    You opened the front door to the Escalade and removed the

7    keys from the vehicle?

8    A    Yes.

9    Q    And you also walked around the back of the vehicle and

10   opened the back door of the Escalade as well; is that correct?

11   A    I believe so.  I can't recall that for sure.

12   Q    All right.  That wasn't necessary to open up the back door

13   to secure the vehicle.  Would you agree with that?

14   A    Yes.

15   Q    Because, presumably, a Cadillac Escalade has an electronic

16   locking button that you can lock all four doors with, right?

17   A    I guess, to the best of my knowledge, yes.

18   Q    That's generally what you would use to lock up and secure a

19   vehicle, correct?

20   A    If it's working, yes.

21   Q    And do you agree with the time line that the government's

22   produced that you would have retrieved the keys and locked the

23   vehicle at approximately 11:58 a.m.?

24   A    Yes.

25   Q    And do you agree with the government's time line that that

ALEX VANG - CROSS

1    would have been approximately three minutes before you call

2    Officer Sherden at the La Crosse County Jail booking desk to ask

3    him what he wants done with the car?

4    A    Yes, sir.

5    Q    You maintained possession of the vehicle keys until Officer

6    Sherden asked you to return with him; is that correct?

7    A    Yes.  My intent was to return the car keys to him.

8            MR. ZACHAR:  I have nothing further.

9                        REDIRECT EXAMINATION

10   BY MS. STELLJES:

11   Q    Do you recall opening the back door of the Escalade as you

12   sit here today?

13   A    To the best of my recollection, I don't.

14   Q    Do you know whether all four doors of the Escalade locked

15   when you pushed the lock button?

16   A    I don't recall, no.

17   Q    Can you think of any other reason why you would have opened

18   the back door?

19   A    To secure the door.  To secure the door or windows.

20   Q    You didn't search the vehicle, did you?

21   A    No, I did not.

22   Q    Did you take any other actions other than rolling up the

23   windows and locking the door?

24   A    No.

25            MS. STELLJES:  No further questions.

─────────────ALEX VANG - REDIRECT─────────────

1           THE COURT:  All right.  I have a few questions for you,

2    Officer Vang.

3        Thank you for being here today, sir.

4        So you were at the Escalade watching the Escalade.  You

5    received a call to go to a nearby location to respond to a

6    different need.  Is that --

7           THE WITNESS:  An officer had asked for assistance,

8    yeah.

9           THE COURT:  Okay.  And then you finished up with that

10    other call --

11           THE WITNESS:  Yep.

12           THE COURT:  -- and you found your way back to the

13    Escalade to give the keys to Sergeant Sherden; is that right?

14           THE WITNESS:  Yes.

15           THE COURT:  Did you stick around for Officer Sherden's

16    search of the Escalade?

17           THE WITNESS:  I did not, no.

18           THE COURT:  So after you handed him the keys, you were

19    done with the matter?

20           THE WITNESS:  I was done.  I had no idea there was

21    going to be any search.

22           THE COURT:  Did Officer Sherden tell you that he was

23    going to search the Escalade?

24           THE WITNESS:  Not that I recall.

25           THE COURT:  And you said that at that point you weren't

1    aware whether Ms. Kendhammer was still at the Escalade?  You

2    didn't see her?

3              THE WITNESS:  I didn't see her, no.

4              THE COURT:  Okay.  That's all I have.

5         Anything more, Attorney Stelljes?

6              MS. STELLJES:  No, Your Honor.

7              MR. ZACHAR:  If I could just follow up with Officer

8    Vang on his memory about the opening of the back door.

9                        RECROSS-EXAMINATION

10   BY MR. ZACHAR:

11   Q    Are you saying that you don't remember whether you opened

12   up the back door as you sit here today or that you don't have a

13   specific memory of it in particular?

14   A    I just don't recall.  It's been a while, so.

15   Q    If I showed you a segment of home surveillance footage,

16   would that help refresh your memory?

17   A    Yes.

18             MR. ZACHAR:  And, Your Honor, I guess I would ask to --

19   I can mark this and admit it as -- or use it as an exhibit, but

20   just for purposes of refreshing recollection, I would ask for

21   access to the video system.

22             THE COURT:  Attorney Stelljes, do you have any

23   objection?

24             MS. STELLJES:  No objection.

25             THE COURT:  Okay.  Then let's see if we can't figure

1    this out.

2         I believe you should have control.

3              MR. ZACHAR:  And I apologize, Your Honor.  Is there

4    a --

5              THE DEFENDANT:  (Inaudible) -- up there.

6              MR. ZACHAR:  I see that.

7         Am I plugged in to the correct outlet here?  I'm plugged in

8    to the HDMI cable, and I'm just wondering why my computer is not

9    mirrored on --

10             THE CLERK:  Try unplugging and then plugging it back

11   in.

12             MR. ZACHAR:  Okay.

13             MS. STELLJES:  If it would be helpful, I --

14             THE COURT:  Looks like we --

15             MS. STELLJES:  -- have my laptop, and I have a video of

16   it.

17             THE COURT:  Oh, I see.

18             MR. ZACHAR:  Okay.  Yeah.  If you don't mind, I think

19   it starts right around two minutes and two seconds.

20             THE COURT:  Well, let's make a clear record of what

21   we're showing.

22         So what is this file?

23             MS. STELLJES:  I am showing Government Exhibit 3, which

24   is the security footage of Vang with the Bates number Beeler

25   171.

1          THE COURT:  Okay.  Thank you.

2          MS. STELLJES:  And what timestamp would you like?

3          MR. ZACHAR:  I had it started about two minutes.

4     There we go.

5     All right.  We can stop at 227.  It stopped at 2 minutes

6     and 32 seconds.  It began playing right around 2 minutes.

7          Thank you, Attorney Stelljes.

8     BY MR. ZACHAR:

9     Q    Officer Vang, does viewing this video refresh whether or

10    not you entered other doors to the Escalade?

11    A    Yes.

12    Q    And does that appear to be you in that video accessing the

13    Escalade?

14    A    Yes.

15    Q    And do you actually appear to be opening both the rear and

16    the front passenger doors to the Escalade in this video?

17    A    Yes, sir.

18    Q    And that would have been in the process of retrieving the

19    keys and securing the vehicle?

20    A    Yes, for that purpose.

21         MR. ZACHAR:  Nothing further.  Thank you.

22         MS. STELLJES:  Nothing further -- well, I'm sorry.

23                    REDIRECT EXAMINATION

24    BY MS. STELLJES:

25    Q    Do you recall where the keys were in the Escalade?

─────────ALEX VANG - REDIRECT─────────

```
1    A    It was by the front of the vehicle, so I'm not sure if it's

2    in the center console or what, but it was by the front.

3    Q    So you weren't opening the rear door to retrieve the keys,

4    correct?

5    A    No.

6    Q    What do you appear to be doing in that vehicle?

7    A    Securing the vehicle.

8    Q    Locking it, right?

9    A    Locking it, yeah.

10         MS. STELLJES:  No further questions.

11         MR. ZACHAR:  Nothing else.

12         THE COURT:  Okay.  Well, thank you, Officer Vang.

13         THE WITNESS:  Yes.

14         THE COURT:  You are excused.

15    (Witness excused at 1:05 p.m.)

16         THE COURT:  Okay.  Attorney Stelljes, does the

17    government intend to introduce any other evidence?

18         MS. STELLJES:  No, Your Honor.

19         THE COURT:  Attorney Zachar?

20         MR. ZACHAR:  No, Your Honor.

21         THE COURT:  All right.  Well, then the evidence-taking

22    portion of this is closed.

23         At this point I think we should agree upon a briefing

24    schedule, unless there is anything more that we should do before

25    we pick dates.
```

ALEX VANG - REDIRECT

```
1          Attorney Stelljes, anything more?

2              MS. STELLJES:  No, Your Honor.

3              THE COURT:  Attorney Zachar?

4              MR. ZACHAR:  No, Your Honor.

5              THE COURT:  Okay.  Then let's talk about the briefing.

6          So I have for your schedule that the next deadline in this

7      case are final pretrial submissions, and those are due on June

8      18.  That makes my Report and Recommendation deadline due at the

9      end of May or, at the latest, early June.  So let's work

10     backwards from there.

11         Attorney Zachar, are you comfortable with proceeding on

12     your motion or do you want the first -- do you want to

13     supplement the motion based on the evidence that you heard

14     today?

15             MR. ZACHAR:  I'm comfortable on the record that's been

16     created.

17             THE COURT:  Okay.  So, Attorney Stelljes, that means

18     you go next.

19         How long do you want for a response?

20             MS. STELLJES:  Could I have ten days, please?

21             THE COURT:  That would make your response due on the

22     18th?

23             MS. STELLJES:  Yes.

24             THE COURT:  Okay.  And, Attorney Zachar, how long do

25     you want for a reply?
```

1        MR. ZACHAR:  I apologize.  The government's response

2    was --

3        THE COURT:  April 18.

4        MR. ZACHAR:  April 18th.

5        THE COURT:  Friday, April 18.

6        MR. ZACHAR:  I was on the wrong month.  I apologize.

7    If I could get until Friday, May 2nd, I would appreciate

8    that.

9        THE COURT:  Attorney Stelljes, any problem with that?

10       MS. STELLJES:  No, Your Honor.

11       THE COURT:  Okay.  Then that's what we shall do.  The

12   government's response will come in April 18.  Any reply is due

13   May 2nd.

14       Attorney Stelljes, anything more on behalf of the

15   government?

16       MS. STELLJES:  No, Your Honor.

17       THE COURT:  Anything more on behalf of Mr. Beeler?

18       MR. ZACHAR:  No, Your Honor.  Thank you.

19       THE COURT:  All right.  Well, very good.  We are

20   adjourned.  I hope everyone has a very pleasant afternoon.

21   Thank you.

22       THE CLERK:  This Honorable Court stands in recess.

23       (Proceedings concluded at 12:28 p.m.)

24                          * * *

25

1     I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2     Reporter in and for the State of Wisconsin, certify that the

3     foregoing is, to the best of my ability, a true and accurate

4     transcription of the digitally-recorded proceedings held on the

5     8th day of April, 2025, before the Honorable Anita M. Boor, U.S.

6     Magistrate Judge for the Western District of Wisconsin.

7     Dated this 13th day of April, 2025.

8

9

10

11

12

13                                    _____/s/ Jennifer L. Dobbratz_____

14                                    Jennifer L. Dobbratz, RMR, CRR, CRC
                                           Federal Court Reporter
15

16

17

18

19

20

21

22

23     The foregoing certification of this transcript does not
       apply to any reproduction of the same by any means unless under
24     the direct control and/or direction of the certifying reporter.

25